Nathaniel Matlock appeals from the denial of his motion to suppress, filed in the Northern District of Iowa. This was a case of a Terry Frisk that Mr. Matlock submits was unconstitutional. He, like Mr. Yeager, pled guilty pursuant to a conditional plea agreement, preserving the right to appeal the denial of his motion to suppress. Mr. Matlock's argument on appeal is that the law enforcement lacked reasonable suspicion to conduct the Terry Frisk that led to the discovery of the firearm for which Mr. Matlock was convicted. I think it's very important in this case to consider the context in the totality of the circumstances analysis with respect to whether there was reasonable suspicion to believe that he was armed and dangerous at the time that the Terry Frisk was conducted. This was a routine traffic stop for an equipment violation. Mr. Matlock was not the driver. Instead, he was a backseat passenger. Once the driver had been arrested for driving with a suspended or revoked license, it was determined that none of the other three occupants in the car, including Mr. Matlock, had a valid license to drive. At that point, with the driver in custody and with the situation under control, Officer Troy Wilson from the Waterloo, Iowa Police Department made the determination that he was going to tow the vehicle. I don't believe there was insurance on the vehicle either. Nonetheless, there was no lawful way that the vehicle could be transported other than by towing it at that point. At that point in time, that's the point in time at which Officer Troy Wilson made the decision to conduct the Terry Frisk of Mr. Matlock. And we'll get into why as the argument progresses. But I do think the context and the time at which the Frisk was conducted is very important. Because at that point, the traffic stop was essentially over with. The only thing left to do was to tow the vehicle away from the scene. The driver was under arrest for her traffic violation. At that point, it would have been a reasonable thing to do to terminate the encounter altogether, to let Mr. Matlock and the other occupants leave the area. They weren't going to drive the vehicle. They weren't in trouble for any other reason. And in that respect, that's why Mr. Matlock argues that there was not reasonable suspicion that he was both armed and dangerous at the point at which the Frisk was conducted. Is there any evidence on the question of you're free to go? Either that the officer did or didn't say that, or that it was requested and denied? The officer did not say that Mr. Matlock was free to go at any point. There is a video of the encounter between Officer Wilson and Mr. Matlock in evidence's exhibit, government's exhibit. And the time was when? The time of the Frisk? The time of day at the site. It was daytime. It was light outside. It looked like a warm summer day. And did any of the four say, I want to walk home? Well, not expressly. But when Officer Wilson ordered Mr. Matlock out of the car, he gave a response when it was clear that he was going to be Frisk. It wasn't, can I go home? But it was kind of, what are you doing? Why is this happening at this point? But I agree there was no either statement from Officer Wilson saying you're free to go or statement, express statement from Mr. Matlock that he wanted to leave at that point. Nonetheless, that is the context in which the Frisk was conducted. The stop was over with. There was nothing more to do. The determination had already been made to tow the vehicle. So on that basis, that's the basis that the court should view the rest of the factors at issue from. That's the context of the situation. The government has offered a number of justifications for the Frisk. They're both what I'd call general and specific. The general basis for the Frisk, according to Officer Wilson and other government, was that this happened to be a high crime area. I submit to the court that the evidence on that score was equivocal. There was evidence from the defense side that this particular neighborhood wasn't subject to much in the way of serious gun crime. There was a homicide in the area in the recent time. But otherwise, the reports that the defense produced with respect to police encounters in that area over a period of time before the Frisk didn't suggest a strong indicia of violence in that area. The government offered further evidence of a broader area of Waterloo, suggesting that it was a more high crime area. But the evidence was equivocal on that grounds. Of course, it's black letter law that being in a high crime area alone is not sufficient to justify a Frisk such as that. What Officer Wilson... It can be relevant. It can be relevant, yes. It's clear from Supreme Court jurisprudence that it can be relevant, but it's not determinative on its own. A fighting point of contention between the parties below was Mr. Matlock's alleged connection to gangs, a particular gang, and whether that justified the Frisk as well. There are cases from this court, United States v. Rowland, United States v. Cornelius, both cited in the party's briefs, suggesting that gang membership is something that an officer can consider. It's not enough on its own, but it is a factor in the Terry analysis. This was a bit different because there was no evidence that Mr. Matlock himself was a member of the particular gang that the officer thought he was associated with. This is a question of line drawing, and it becomes very difficult in my view to rely upon alleged gang association if we're not able to draw a line at the person as a documented, known, verified gang member. That's not what Mr. Matlock was. Officer Wilson believed he was associated with gang members, and the district court below said it's an exercise in semantics to draw a difference between the two, but you have to draw a line. You can imagine a circumstance to take an extreme where you have an individual whose father was a gang member but that individual has risen above, got a Ph.D. from the University of Iowa, happened to be walking through a high-crime area. Is that enough under the analysis? I recognize that's not this case, but you have to draw the line somewhere, obviously, and the line should be drawn at documented, verified gang membership. As far as specific bases that Officer Wilson relied upon, he relied on three instances of which he was allegedly aware of Mr. Matlock being at least associated with some event in relation to a firearm. Only one of the alleged instances involved an allegation that Mr. Matlock himself brandished a firearm. That was the May 11, 2016, alleged incident where Mr. Matlock's ex-girlfriend reported to police that Mr. Matlock had brandished a firearm in an incident. It doesn't appear that Mr. Matlock was ever charged and, of course, not convicted for any allegations, so that was pretty thin. The other two instances involved an informant back in March, 2014, telling police that Mr. Matlock was involved in a shots-fired call in some nebulous way. That was more than two years before this Terry Frisk. And the other incident was a March 28, 2016, incident where Officer Troy Wilson himself was dispatched to a shots-fired call where it appeared that Mr. Matlock was simply a witness in the vehicle where shots were allegedly from, but Mr. Matlock had stayed on the scene and essentially acted as a witness, didn't have a firearm, and there was no specific allegation that he was the individual who shot the gun in that instance. Were any Waterloo impoundment policies put in the suppression record? No, Your Honor. No, Your Honor. So it really does come down to the reasonable suspicion for Mr. Matlock being armed and dangerous. The district court issued the government's citation of the Supreme Court Johnson's notion that police aren't constitutionally required to let a dangerous people have their back, so to speak. That's a pretty good point if there wasn't some reason that he shouldn't. Was this somewhat pretextual because of the suspected, suspicious circumstances that caused them to follow the car in the first place, or was it routine that people who are properly ordered out of cars that are about to be towed stay there until the police find them a way to get home? It sure didn't look routine if you look at the video of the encounter between Mr. Matlock and Officer Wilson because he has the driver arrested for the traffic citation. He determines that it's Mr. Matlock in the back seat. He goes directly to Mr. Matlock. He doesn't go to the other back seat passenger. He doesn't go to the front seat passenger, which if that were the policy, that would seem to be the reasonable thing to do. This was something that was targeted at Mr. Matlock. With the court's permission, I'd reserve the rein of my time for rebuttal. Very well. Thank you. Mr. Bowers? Good morning again. On L Street, Logan Street, L Block, as it's referred to by the gang members in the area, there really is no routine traffic stop. The officer who did the pat down in this case is a member of a specialized team. They call it VCAT, Violent Crime Action Team, or something to that respect. They always have to have an acronym, but in this case it's VCAT. Again, the acronym is V-C-A-T, VCAT, Violent Crime Action Team. And what is in the record is that when this stop for a bad tail light was enacted, three other officers came to the scene. That is the fact. That is the situation. In Waterloo at the time, and now, there is the Logan Block, where a particular gang set, L Block, lives, and that's their territory. There is another street gang set with whom the defendant associates called the Black Flag Mafia. When the Black Flag Mafia people are on L Block, Logan Street, they're in the wrong part of town. They are at risk. It is a situation culturally there that would cause the visiting parties to be at risk. It is a high crime area. You can pull out the stats and compare and contrast, but the bottom line is the officers in this VCAT team know that it's a scary place. It's a high crime area. They go to stops en masse, and they are vigilant. The oral argument presumes that they're, I mean, to have a frisk, you have to have a reason, you have to have a basis for the person being. Right. A reasonable, articulable cause to believe that criminal activity, and then are you scared, officer? Is there a reason to believe that this man is armed and dangerous? That's the second prong. When they're out of the car and it's about to be towed and the traffic stop is done, what's the basis for detaining? Forget frisking. Right. Let me step you through the facts as I understand them, Your Honor, please. Yeah, maybe not as thoroughly as possible, but it's a car driven by a person with no license. The front seat passenger has no license. Inquiry is often made. Is anybody in this car able to drive this car home? The folks in the back seat, inquiry is made, and at that point there's a, oh, wow, moment in the officer's mind because he recognizes the defendant who is sitting in the back. He knows him by name. He knows him from at least three previous meetings having to do with shots fired or gun possession. The officer at this point is, for lack of a better term, scared. He has reason to believe that this man has had firearms, and the latest being two months earlier than this July stop. Of significance also. Do you have a total case where the detention is justified this way? Of significance? No, Your Honor, we did not cite that. However, I think anecdotally, and it could have been said, and I'm saying it now, that if this car were to be left on L block, there wouldn't be much left of that car. It wasn't fleshed out, and that wasn't the reason, though, for the tow. What is in the record, Your Honor, excuse me, is that there is an open container of booze between the defendant and his pal. All right, sorry. The basis to detain Matlock, which caused the need to worry about whether he was armed and dangerous and should be frisked. In a situation like that, people can be ordered out of the car briefly. The car can be towed. Exactly, but before that even, this defendant was patted down because the officer recognized him. He was out of the car. Now, he was in a blacked out car. The windows were blacked out in the rear of the car. When the officer recognized who it was, instantly had him put his hands up against the car. The defendant didn't do that right away. There was a pause. There was a why me moment, and this officer knew him. What was the Fourth Amendment basis for saying put your hands on the car? Terry. A probable cause to arrest him? Reasonable belief that he had a firearm in his possession, that he was. . . Frisk standard. You've got to meet the detention standard in order to have. . . Certainly, the car was. . . Frisked. Certainly, the car was seized. It was stopped for a legitimate purpose, first prong of Terry. Get out of the car and get out of here. And when he got out of the car with a bottle of booze sitting between him and his pal, and that's a criminal offense itself, actually. Open container in Iowa, which is another matter. But before that was even addressed. . . Passengers, yes, Your Honor. That's right. You can't have a bottle of booze between you. There's a smell of booze. That's in the record, of course, here. But there would be reason, actually, to arrest the folks in the back near that bottle of booze. At least probable cause. But the matter was, it didn't get that far. Because once this defendant was recognized as a gun-carrying person, as late as two months earlier, and in three distinct situations, this officer knew he should have been patted down. It's 8 o'clock in the evening. It's not dark. It's July. But would you rather be shot in the daylight or would you rather be shot at night, officer, is the question. Officer Wilson was out of his patrol car for some reason and walking on L Street. And he recognizes Matlock's walking in front or behind her. They're passing each other. And he says, I know you for all the reasons that are in your brief. He says, wait a minute, I'm going to frisk you. Probably not good. Not enough. And some of your cases say that. So just the fact of what he knows about him. It's enough to cause him pause to say, hold on, I want to check before we proceed. In my street encounter. Right. He says, you know, you look familiar to me. Can we talk? Can we talk a little? Perfectly fine. Sure. And now he sees a Bulger for whatever reason. He sees a leading to the right. Right. I think that's okay. Even if it's a consensual encounter. But there has to be some reason for an encounter to be prolonged enough to trigger the frisk analysis. And other than the open bottle, I'm not sure I see it here. With due respect, there was no stopwatch angle on this judge. But it was a quick encounter. It's a stop. People out of the car. The folks in the back who are not visible. Once they get out, this officer recognizes this defendant. If the tow and impounding policies were in the record, I'd want to study them. Because they may well say something about what to do with the occupants when you've made a legitimate decision to tow. I'm sure they do. But I'm not testifying here. And it's not in the record. And you're right about that. They're not in the record. My argument is, it doesn't get that far. It's an examination of the folks in the vehicle. What are we going to do here? How do we address this? When the folks in the back come out, we smell booze. We see an open container. But before any of that, the defendant is recognized. And the officer is scared. That's my term. But you teach where you're scared. And then articulate that.  Why were you worried that this guy would have a weapon? A knife or a gun? Or something that could hurt you while you're continuing on with this investigation on what to do with the car, what to do with the bottle, what to do with the scene as it is. It didn't get any further than the defendant being patted down and a .40 caliber pistol was in his waistband. Is it fair to say, I mean, is it realistic to say that in the real world of policing, in this area especially, anyone who has developed a reputation as carrying a weapon, reputation as a police officer, carries with them what is it called? The biblical reference would be the mark of Cain. I'm familiar with that reference, Your Honor. But it would be the mark of scrutiny, for sure. I would not turn my back on that man if I knew those things. And if that's what you're talking about, that's exactly right. The officer doesn't have to go in naive. The totality of the circumstances includes his knowledge, his training, his talking back and forth with other officers, his being there day to day to day with a full understanding of what's going on at 8 o'clock in the afternoon on L block. All those things come into play here. You can't have a divide and conquer sort of a situation where you pick this all apart. It's the totality of things. And this officer did it right. What's the name of this street? It's Logan Street. They call it L block. Is it fair to say that Waterloo, Iowa, in this area is not Meredith Wilson's River City? I think that's right. Every city has one, unfortunately, from time to time to time. Yeah. Somehow later in life I'll conquer my inability to keep from offering gratuitous comments. So thank you for your argument. Thank you. I appreciate it. Mr. Hanson. Very briefly, Your Honor, the phrase smacks of recent invention was quoted in the earlier argument. And that's what the government's position is with respect to this alcohol in the back of the vehicle. It had nothing to do with the stop. It had nothing to do with the extension of the top. No one was investigated for open container. No one was arrested for open container. There was no reason at that point to continue to detain Mr. Matlock. And there was no reason for the frisk. The district court should be reversed. Thank you. Nice touch of you to pick up on that. The case is submitted and we will take it under consideration.